Hearing, hearing, hearing. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and its Honorable Court. Good morning. This is Beverly Martin. We're glad to have you gathered here together. We wish we could be together in person, but I'm not sure when that's going to happen. Judge Newsom and I are delighted today to have with us Judge O'Scanlan from Portland, Oregon. Many of you may know that Judge Newsom is very proud to have clerked for Judge O'Scanlan, so this is a wonderful reunion for the two of them. I've enjoyed being with Judge O'Scanlan on other occasions, so it's nice to have you back, Judge O'Scanlan, and thank you for helping us with our work today. Thank you, Judge Martin. It's a pleasure to be here. All right. With that, I hope everybody's well. Is counsel well? Everybody's recovered? I guess you're muted, maybe, so I hope you're recovered. I have asked Ms. Geddes to let you all know when you are two minutes away from the expiration of your time, and so she's going to do that, and sometimes it takes a couple of times for her to say that for everybody to hear it. But with that, we will get underway with the case that I'm referring to as Michael Levine and Jennifer Levine v. Mark and Jillian Addy. Good morning. Good morning, Your Honor. This is Brian Howey for Defendant's Appellant. Thank you, Your Honors, and may it please the Court. In my time today, I will focus on three issues. First, the district court's abusive discretion in its ruling on defendant's motion to transfer. Second, the district court's error in handling the issue of arbitrability. And third, the district court's error in failing to compel arbitration under the express terms of the arbitration provision. Turning to the transfer motion, the district court misapplied the 1404A factors, splitting plaintiff's case in half and directing that it proceed simultaneously in two different federal courts on opposite sides of the country. This result is impractical, it poses a serious risk of inconsistent rulings and results, and it is an enormously inefficient use of judicial and party resources. Now, the 1404A inquiry proceeds in two parts. The first part, the plaintiffs do not contest in their brief, and that is, could this action have originally been brought in the Central District of California? The second question is whether the convenience and interest of justice require transfer to the requested forum. Let's begin with the text of section 1404A. 1404A refers to the power of a district court to transfer a, quote, civil action, unquote, to any other district or division where it might have been brought. That statutory text contemplates a district court treating plaintiff's case as an integral whole, and the district court's decision in this case is inconsistent with that language. This is Beverly Martin. I just want to go back to basics for a second here and be sure I understand this. So neither Jeff Rogers, as I understand it, neither Jeff Rogers or Michael Levine ever executed a contract with Herbalife. Am I right about that, or have I got that wrong? Both Jeff Rogers and Michael Levine were spouses of signatories, Your Honor, but in this case, both Mr. Levine and Mr. Rogers are no longer in the case. Mr. Levine and his wife withdrew from the case, and if you look at Plaintiff's Brief, page 6, footnote 2, that was where Plaintiff's Counsel and Plaintiffs indicated to us and to the court that the Levines had withdrawn. And then Mr. Rogers, unfortunately... Mr. Howie, could you repeat that citation? Yes, certainly. In the Plaintiff's Response Brief before this court, page 6, footnote 2, they indicated that Mr. Levine and his wife withdrew from the case during the pendency of this appeal. And then with respect to Mr. Rogers, Plaintiff's Counsel notified Defense Counsel in mid-February of this year that, unfortunately, Mr. Rogers passed away. So we're left with five of the original eight plaintiffs, and none of those five are spouses. They are all signatories of distributor agreements with Herbalife. Okay, that's helpful, and I'm sorry for Mr. Rogers, obviously. So it's my understanding that there's no remaining defendant in this case who was a party to... I mean, I'm talking about... I understand your equitable, estoppel argument, but just to be clear, there's no remaining defendant in this case that was a party to a contract with any remaining plaintiff. Am I right about that? There is no direct contract between any of the remaining plaintiffs and the individual defendants. However, all of the individual defendants, all 44 of them, are parties to distributor agreements with Herbalife. Those agreements, like the plaintiff's agreements with Herbalife, incorporate the rules of conduct and distributor policies. And those rules contain an arbitration provision and have contained an arbitration provision since October 2013. So our position is that all of the plaintiffs and all of the defendants are, in fact, signatories to an arbitration provision. And in particular, an arbitration provision that the scope of which is very broad and governs disputes or claims that arise out of or relate to a distributor's relationship with another Herbalife distributor. Mr. Howey, hold on. I'm sorry. This is Judge Newsom. Let me just ask you a quick question about the language. You're right that it has this arise out of or relate to in any way to any dispute between a member and another Herbalife member. But doesn't it specifically provide that arbitration is required for claims by member against Herbalife or Herbalife against member? That is what the language says, Your Honor. Our position, however, is that it would be impractical in this case for every single distributor of Herbalife to be a party to a separate arbitration provision with every other distributor, given the number of distributors and the way direct sales companies' downline networks are set up. Mr. Howey, this is Judge O'Scanlan. Doesn't that undercut your argument? There's no privity here. Your Honor, we feel that the scope of the arbitration provision is broad enough to cover distributor claims against another distributor, particularly where plaintiffs have pled their claims jointly against both Herbalife and the other distributors. There is an association, in fact, enterprise alleged in the complaint, and the defendants, the individual defendants and Herbalife are alleged to have acted in concert in furthering the affairs of the enterprise. But with respect to the issue of arbitration, there is no language, no contract arrangement between your clients and the plaintiffs here that would commit them to arbitration. But with respect to claims between the distributors, there is no contract language which would apply, is there? There is not a bilateral contract between an individual plaintiff and an individual defendant. As I mentioned, they are all parties to the exact same arbitration provision. And one other point I do want to make, which is that plaintiff's challenge to the enforceability, validity, and existence of an arbitration provision is a challenge to arbitrability. And our contention is that pursuant to the express delegation clauses and the incorporation of AAA rules, that the court should have sent the entire matter to arbitration for an arbitrator to decide not just the merits of plaintiff's claims, but also all of these questions of arbitrability, including the question of whether plaintiffs had actually agreed to arbitrate their claims against individual defendants. But again, the only way you get there is through equitable estoppel, right? I respectfully disagree with that, Your Honor. I think equitable estoppel for us is a fallback position. If the court looks to the decision of the Fifth Circuit in the Britannia-EU-Nigeria versus Chevron case, you will see that in that case where the parties, the signatories to an arbitration provision clearly and unmistakably delegated questions of arbitrability to an arbitrator. In that case, the Fifth Circuit compelled arbitration not just of the plaintiff's signatory's claims against the defendant's signatory, but also against two non-signatory defendants. And the Fifth Circuit in that case did not apply the principles of equitable estoppel. What it did was conclude that the party in that case who was seeking to avoid arbitration, which was the plaintiff's signatory, Britannia-EU-Nigeria, because that party was a signatory to the arbitration clause, and because that party was a signatory to the express delegation clause, that it was proper for all of those claims, including challenges to arbitrability, with respect to a non-signatory, that all of that should be avoided. All of that should not be sent to an arbitrator to decide. So this is Judge Newsom. Your point is that even the equitable estoppel issue should have been sent to the arbitrator in the first instance? Correct. Based on the express delegation clause, which is very broad and is contained in the arbitration provision, and has been contained in the arbitration provision since October 2013, as well as the arbitration provision's express incorporation of AAA rules. This court in JPAY and in Terminax held that both of those things, an express delegation clause and incorporation of AAA rules, constitute the clear and unmistakable delegation of arbitrability questions to an arbitrator. The Supreme Court has said just last year in the Henry Schein case that when a party's contract delegates arbitrability questions to an arbitrator, a court cannot override the contract, even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless. And is that true? I guess I just worry, and maybe this is just sort of endemic to this area of the law, but I guess I worry a little bit about sort of like an infinite regress or something, where you say the delegation shuffles everything off to the arbitrator, but if the challenge to the enforceability of the delegation clause, you also say likewise, is a question of arbitrability shuffled off to the arbitrator? Well, I think yes, but I think in this case, I would argue that the plaintiffs have not established that the delegation clause was independently unconscionable. And again, the operative date here is October 2013. That is when Herbalife added an arbitration provision to its rules, and as I mentioned, those rules are incorporated into every distributor agreement that every distributor signs with Herbalife. And since October 2013, the arbitration provision has contained a very broad express delegation clause, and it has also expressly incorporated the AAA rules. So I think it would be very difficult for plaintiffs to establish that the delegation clause itself was independently unconscionable, either on a procedural or a substantive basis. It's been right there in the agreement for the last four years, or excuse me, the last seven years now. And the only case that plaintiffs cite on the question of unconscionability of a delegation clause, the Savaria case, is factually distinguishable. In that case, a delegation clause required the plaintiffs to arbitrate in the defendant's home forum and pay the arbitration fees and pay its own attorney's fees. And to the contrary, Herbalife's arbitration provision here, the one that's been in effect since October 2013, that arbitration provision has always provided that arbitration shall take place in the plaintiff's home county. That the arbitration fees will be paid by Herbalife if the claims are under $75,000 and that Herbalife is not entitled to recover its attorney's fees. So I think regardless of whether the court concludes that a court must in the first instance determine the enforceability of a delegation clause or send that question to an arbitrator, either way the plaintiffs lose here on that question. Counsel, going back to your original point about the motion to transfer, do we have jurisdiction to entertain your claim there? Yes, Your Honor, you do. This court has the discretion to review the transfer ruling based on the doctrine of pendent appellate jurisdiction. Both the transfer motion and the motion to compel arbitration were filed on the same day and sought alternative relief. They were noticed for and argued at one consolidated hearing and the district court ruled on them in a single order. But they weren't just entwined. There was no intertwining here. Each issue could be decided separately, could it not? Well, I think one ruling has a de facto impact on the other, Your Honor, though. I'm not aware of a case that says when a district court is presented with both a motion to compel and a motion to transfer that it has to decide them in a particular order. And by denying one, the court necessarily has to rule, potentially has to rule on the other. The same set of operative facts here were presented. Both motions asked the district court to determine the proper forum for plaintiff's claims and to interpret the same set of operative documents, the contracts which contain both the forum selection clause and the arbitration clause. And again, if we look to the text of Section 1404A, we see that what a district court is authorized to do is transfer a civil action. As the district court in the McNair case concluded, it would be inappropriate to transfer individual claims as opposed to the entire case. And in the McNair decision, the court cited two decisions from the Second, Fourth, and Tenth Circuits that interpreted Section 1404A in the same manner. Turning specifically to the 1404A factor of trial efficiency in the interest of justice, this is actually an area, Your Honor, where plaintiffs and defendants are in agreement. If you look to the plaintiff's response to the motion to transfer that was filed below on page 11, this is docket 98, page 11, plaintiffs argued that if the court were to sever the case and have the plaintiffs proceed in parallel proceedings, that that result would be unduly prejudicial, unreasonable, and it would be an outcome that would not serve the interests of judicial economy. In this case, we now have two, potentially two, nationwide class actions pending at the same time involving the same class, the same alleged enterprise and conspiracy, the exact same claims, and the same damages, which leads to the possibility of duplicative discovery, inconsistent rulings and results, and double recovery potentially for the plaintiffs. As the district courts held in the McNair and Nemo Associates case, when you have some plaintiffs in a matter that are bound by a forum selection clause and some that are not, and the district court has chosen to enforce and uphold the forum selection clause, the appropriate course of action is to transfer the entire matter and not just part of the matter to the transferee forum. As the district court in McNair explained, plaintiffs who are not bound by a forum selection clause are nevertheless bound by their choice to bring suit in concert with those plaintiffs that are bound by a forum selection clause. Ms. Geddes, are you calling the end of time as well? Because I don't have a clock to time it. Yes, but the judge was talking and I didn't want to interrupt. I'll reserve the balance of my time for rebuttal then. Thank you, Your Honor. All right. Thank you. Good afternoon. Your Honor, may it please the court, a time mark for the path of these from the law firm of Mark McDowen Hayden. Your Honor, I'd like to focus in on some of the points and questions that were made by the panel, which is specifically that there is no contract between any of these third parties and any of the plaintiffs or appellees here. And Judge Barton's correct point that the only way you get to any of this is through equitable estoppel. That is correct. Before the court even considers any of these issues relating to, for example, the unilateral amendment by Herbalife, whether the arbitration provision clearly delegated issues of arbitrability to the arbitrator, and then, of course, which version of the arbitration provision applies at all, because none of the plaintiffs or appellees signed the arbitration provision that the appellants are seeking to enforce here, the first thing we need to get to is equitable estoppel, because that is the hook that allows the appellants to latch onto the agreement between Herbalife and the appellees. That is the only thing that gives them access to those rights, whatever those rights may be, including arbitration or the potential rights of arbitration. So it is our position that the mechanism that allows the appellants to bring this matter of the arbitration provision or its delegability to the floor is through the doctrine of equitable estoppel. And not only is that consistent with the case law, including California law, Florida law, and I believe it's informed by the recent United States Supreme Court decision in the GE Energy Power case, it's also common sense. As Judge, I believe it was Judge Newsom, indicated, we do have this sort of infinite regress problem here, which is that if somebody could always just invoke, if a non-party, non-signatory, could invoke another contract's concept of delegation, any time that there's a dispute between two other parties, then every single case would go into arbitration as a preliminary matter to determine its arbitrability. And that cannot be the law, and that's not in fact the law. Can I ask you a quick question? So on equitable estoppel, are we all basically agreed that to determine whether equitable estoppel applies, we have to understand whether the plaintiff's claims rely or sort of necessarily pass through the agreement? Yes, and the humanic case out of the 11th Circuit I think has a very good articulation of what the precise test is for equitable estoppel. And in that case, Your Honor, the court specifically said that equitable estoppel requires the parties to be, it's not just that the parties are relying on the contracts, but it has to be inextricably intertwined with the claims, with the specific claims that the party is bringing in this case. So yes, Your Honor, I believe that is correct articulation. So help me with that, and I might need help from both sides on this. I mean, at base, right, you're claiming that the defendants made misrepresentations to you about the nature sort of of how compensation worked. And how can that claim not at least require resort to the agreement, which I presume specifies terms of compensation? Your Honor, we are not, this case is not about how it is that people were compensated. That is not what this case is about. This case is about a group of plaintiffs who were convinced to attend worthless events in order to learn the so-called tricks of the trade. The individual defendants here would tell the plaintiffs that the event attendance was critical and that there was a direct correlation between event attendance and success in Herbalife, and this was all alleged to be a lie. Importantly, the vast majority of these events were not Herbalife-run events. These were events that were put on by these independent distributors through a web of entities that these individual distributors control and that these entities profit from. That is what is alleged in the complaint. There is no accusation or allegation relating to a breach of contract. There is nothing relating to tortious interference with the contract. So this has nothing to do with the distributorship agreement itself. The only potential relationship to the distributorship agreement itself, which is what the appellants suggested in their brief, is that, well, you wouldn't go to the events if you weren't a distributor. Well, that's not the standard. And that exact concept was rejected by the California courts in Goldman v. KPMG with reference to this court's ruling in the Humana case. And in that case, the defendants, KPMG and the law firm of Sidley Austin, sought to compel arbitration based on the existence of operating agreements that contained arbitration clauses, and it was those operating agreements that essentially created the vehicle for certain investments that were alleged to be at the center of this RICO enterprise. And the court found that was not enough, highlighting the necessity and, again, consistent with the 11th Circuit's determination that it requires the plaintiff's actual dependence on the underlying contract in making out the claim against the signatory. That is the crux of an appropriate situation for applying equitable estoppel, and we just do not have that here, and that is not what is alleged here, Your Honor. So we believe that without the appellants being able to get past this threshold issue of equitable estoppel, that is the beginning and the end of the analysis. There is no more ability for the appellants to access the arbitration provision or the delegation provision. The case to which the appellants cite, we believe, is completely distinguishable, other than it, of course, not being binding. And that case was, in fact, distinguished by a court in the Southern District of Florida. I'm referring to the Britannia case that counsel mentioned, which was distinguished by the SBMH group case, which is 297S sub 1321. So we don't believe that that analysis is accurate, and it's also worth noting that in the Britannia case, that involved agency that did not involve equitable estoppel. So we believe that they don't get past the equitable estoppel analysis, and the district court was correct in applying it. We also disagree with the appellants on what the standard of review is with respect to the court's determination with respect to equitable estoppel. It is our contention that it's the abuse of discretion standard, and that is consistent, again, with the Havana managed care case where the court stated, quote, in light of the foregoing, we agree with the district court that the present RICO suit does not present an appropriate instance for equitable estoppel, and even if we did agree, I'm sorry, even if we did not agree, we would be hard-pressed to identify any abuse of discretion in the court's decision to forego application of the doctrine. And there's a series of cases that stand for that same proposition, and, of course, the general notion that a court's exercise of equity is going to be reviewed under the abuse of discretion standard. And so we don't believe that the de novo standard would apply in any event. Now, I'd like to briefly touch on a point that was made by Judge O'Scanlan relating to pending jurisdiction. There is no pending appellate jurisdiction here, and the test that counsel is suggesting is the test that should apply. It's simply not the test that is embraced by this circuit, and I think it would open up really the floodgates with respect to what the court should and should not exercise pending appellate jurisdiction over. The pending appellate jurisdiction is to be employed rarely. I've not seen and I've not been able to find any case where pending jurisdiction is applied in anything remotely resembling the fact that we have here, and of particular interest is the King case, the Sedno v. King case. And in that case, Your Honor, the court found that even where there was still had to be a determination or an analysis of the 1404 factors for the party that was appealing and for pending jurisdiction did apply to the party that the court found that there was no pending appellate jurisdiction. The court refused to apply those 1404A factors and conduct that analysis with respect to the party over whom it declined to exercise pending appellate jurisdiction. So even though there was some overlap in connection with the analysis that had to be done, the court still made a determination that it was not going to be exercising pending appellate jurisdiction. And certainly the fact that the hearing is on the same day and the fact that the motions are filed on the same day and the fact that there's one order that encompasses both of the court's rulings, that does not provide a basis for pending appellate jurisdiction. So respectfully, we don't believe that the court should be considering the issue of pending appellate jurisdiction here. And, of course, even if it... I'm sorry, should be considering the issue of the transfer here. And, of course, we believe that in any event, for the same reasons that equitable estoppel fails relating to the analysis under the arbitration provision, it also fails with respect to the forum analysis. This is Judge Newsom. Can I just... I guess in a way that's a segue, but in a way I'm just asking you to rewind the tape because this is an important point for me. I take your point about equitable estoppel being in some ways a threshold issue for the court, and if the other side can't pass through equitable estoppel, then all of this just sort of goes away, hence the importance in my mind. Can you just tell me again... I think I'm having a hard time understanding how it is that your claim here... You say it's sort of a misrepresentation about sort of success in the enterprise. Is success measured per your claim by some measure unrelated to compensation or money? And if it is about money, just explain to me again how it is that the claim doesn't require at least resolution of some questions about the distributorship agreement and presumably some comp scheme specified in it. Sure. Well, first, I think it's telling that in none of the briefings submitted by the appellants, and of course in none of the arguments that we heard today from the appellants, they don't actually refer to any contractual provision that we need to rely on in order to succeed in our claims here. I guess maybe you can just tell me yes or no. Does the distributorship agreement have a provision about compensation that explains how distributors are compensated? The agreement itself does not have that. I don't believe there are incorporated rules that do lay out sort of the general scheme of the compensation structure. Okay, so I didn't mean to understride. So given that background, tell me why we don't have to consider the agreement and or the incorporated rule to assess your claim. Because this is not a claim about whether or not we should have been paid, and this is not a claim about whether or not there was money that we were entitled to that we didn't somehow get under the agreement or under the rules. That's not what this case is about. And the distributorship agreement itself doesn't say anything about events. What the distributorship agreement does is that it provides the plaintiffs a right to buy and sell Herbalife products. That's basically what the distributorship agreement does. That's not what this case is about. This case is about the fact that these individual defendants, the appellants here, they tell the plaintiffs how important it is to go to these events and how critical it is to go to these events, and they continually barrage the plaintiffs with the importance of event attendance in order to attain success within Herbalife. Just so I'm clear, when you say success, what does success mean except getting paid more? What it also means is developing a downline. So Herbalife is an MLM, and there's a couple of ways that you achieve success in Herbalife. It's certainly through the sale of product. That is one of the ways. But it's also really through recruitment, and it's through recruiting other members to be in your downline and then getting them to sell products. And then when they sell products and when they recruit people, then you get commissions as a result of that. And so that's part of sort of the Herbalife scheme. But it's important, Judge Newsom, to remember that the test for equitable estoppel is far more stringent than just, is there a potential relationship between the contract and the claims? Excuse me. Is there any reference in the distributorship agreements to the circle of success events, which, of course, is the essence of this RICO claim? With respect to the compensation, for example, is there any specific requirement that people have to go to these events? No, no, there's not. Counsel, two-minute warning. And, again, we're sort of talking about this contract and this set of rules as if this was a static document. That's not what we have here either. The set of rules and the contracts that the appellants are trying to impose on the appellees here wasn't even in existence at the time that some of the claims that we're making occurred in this case. The set of rules that they're seeking to impose were foisted upon the appellees here via, without notice, based on Herbalife's alleged unilateral right to amend the contract at any time. There's not an iota or shred of evidence in the record that any of the plaintiffs, in our case, ever actually received notice of this 2016 amendment that the appellants are trying to use here. And as counsel pointed out in his argument, the arbitration provision in that case has things like Herbalife is going to pay for the arbitration, Herbalife is going to reimburse costs for the arbitration, Herbalife is going to pay fees for the arbitration under a certain set of circumstances. There's some real practical implications here of compelling arbitration that have just been completely ignored besides which arbitration provision would even apply. It's very clear, as I think Judge Newsom pointed out, that the version of the, to the extent any of the plaintiffs did actually sign arbitration provisions, and there's only three of them that did, that arbitration provision is very clear to only relate to claims between a member and Herbalife. In fact, the title, the title of that arbitration agreement is, quote, arbitration agreement for disputes between members and Herbalife. That's the actual title of the provision in the agreement itself. So these practical implications, I do not believe, should be ignored, and what the appellants are asking the court to do to the extent they get past equitable estoppel is to then have the court rewrite the arbitration provision that's in place. An arbitration provision that, by the way, probably only can exist in the first place. Thank you. Thank you. Thank you. Valerie, how much time do I have left? Five, five minutes. What? I think she said five minutes. Thank you. So, Your Honors, a couple of points I'd like to address with respect to equitable estoppel. Again, assuming that the court concludes that equitable estoppel is, needs to be applied here for defendants to compel arbitration. First of all, the standard of review issue. As we pointed out in our reply brief at pages five to six, the Croma makeup case, which was decided after all of the decisions that the plaintiffs cited in their response brief, provides that the standard of review of a motion to deny, excuse me, of an order denying a motion to compel arbitration, the standard of review is de novo, and in that particular case, the only basis for compelling arbitration was equitable estoppel, and this court concluded that de novo was the appropriate standard of review. Now, with respect to the application of the equitable estoppel test, we argue that we satisfy both of them, and the critical issue is the one that Judge Newsom was asking plaintiff's counsel about, and that is whether or not the claims that plaintiffs make in this case either rely on or make reference to or are intertwined with the terms of the contract, and in this case, it is an unqualified yes. I guess, just in fairness, I mean, in reference to wouldn't get you home, right? I mean, it's got to be founded on, inextricably intertwined, dependent on. Like, it's a pretty tight nexus, right? Yes, and we satisfy it here, Your Honor. Okay. Plaintiff's whole theory of the case is that defendants have, in Herbalife, have misrepresented the importance of event attendance for financial success within Herbalife, and I think Your Honor's question's drilled in on one of the core issues, which is what does success mean? It's a relative term. Success in this case for the plaintiffs means success in the Herbalife business. Plaintiffs in this case are or want to be Herbalife distributors, and they want to make money as Herbalife distributors. The documents that create the Herbalife business, that create the business opportunity, are the distributor agreement, which incorporates both the rules as well as the sales and marketing plan, which is sometimes referred to as the compensation plan. The rules govern how distributors act and interact with one another, and the sales and marketing plan governs how distributors earn commissions, how they earn money and income stream as an Herbalife distributor. Judge O'Scanlan here asked this question. This is a RICO case, and the claim is that the Herbalife company and I suppose the top distributors  to attend these meetings under some sort of false pretenses. Where is that referred to in any of the distributor agreements? Your Honor, I don't think their argument is that they were compelled. Their argument is that Herbalife distributors misrepresented to the plaintiffs the importance of attending events for purposes of succeeding in the Herbalife business opportunity. But where did they make that misrepresentation? Where in the distributor agreement did it refer to the circle of success, and where does the distributor agreement tie that in? The issue, Your Honor, is not that the distributor agreement, whether the distributor agreement has to refer to the circle of success. I think what's important here is to look at what are the allegations in the complaint, and those specifically tie plaintiff claims to the business opportunity. And the business opportunity is defined by the very contractual documents that contain the arbitration provision. So if we look at paragraph 330 of the complaint, the proposed class are persons who attended events quote, in pursuit of the Herbalife business opportunity. If we look to paragraph 333 of the complaint, which identifies alleged common issues of fact among the punitive class members, and you see references to whether defendants withheld material information, whether banned methods were used, whether disclaimers were legally sufficient, all of these things relate to and directly relate to conduct by distributors. And the distributor's conduct in making representations and talking about the Herbalife business opportunity and making claims about lifestyle and income stream that can be achieved, those are all governed directly by provisions of the rules. If the court looks to the 2016 version of the rules, which is in the record at docket 62-2, pages 628 to 711, and I would recommend the court look at rule provisions 3.1.8, 5.2.2, 6.1.1, 6.1.4, and 6.1.5. And I would also say it's important in analyzing this equitable estoppel test to consider what would a trial of this matter look like? What kind of evidence would plaintiffs have to present to establish their claims? Well, they would have to prove the existence of a distributor relationship, which would require them to introduce evidence of the distributor agreement and all of the documents incorporated thereto, including the rules and including the comp plan, the compensation plan, which governs how distributors get paid. Consider one of the misrepresentations is that speakers at events that plaintiffs attended allegedly succeeded in their Herbalife business by violating the rules. And so, again, to determine whether the distributor defendants or others had violated the rules, you would need to look to see what things are permitted under the rules and what things are prohibited. And finally, to prove injury, it would be necessary for plaintiffs to show the manner in which they pursued the Herbalife business opportunity. All of these things make the rules... Counsel, your time has expired. Thank you, Your Honor. Thank you. We appreciate the argument and we will take the case under consideration. That concludes our arguments for today. Thank you, Ms. Gettis. Thank you, counsel. And we're in recess.